**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ANTHONY JOHNSON, # 38654-044,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17-cv-237-JPG** |
| | ) | |
| **DOUGLAS KRUSE,** | ) | |
| **ZELLDA BELL,** | ) | |
| **S. MICKELSON,** | ) | |
| **M. WARREN,** | ) | |
| **JAMES CROSS,** | ) | |
| **OFFICER MILES,** | ) | |
| **J. ASHMORE,** | ) | |
| **S. WHITE,** | ) | |
| **and Mr. S. ALBERT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter is before the Court for a merits review of Plaintiff's First Amended Complaint (Doc. 9), filed May 24, 2017, at the direction of the Court. On May 10, 2017, the Court dismissed the original Complaint for failure to state a claim upon which relief may be granted, and ordered Plaintiff to submit an amended pleading if she wished to further pursue her claims. (Doc. 7).

Plaintiff is a transgender individual[1] who was incarcerated at the FCI-Greenville when she brought this action for alleged violations of her constitutional rights by persons acting under the color of federal authority. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Since bringing this action, Plaintiff was transferred to the FCI-Terre Haute, Indiana, (Doc. 4),

---

[1] Plaintiff is transitioning from male to female. The Court will use feminine pronouns to refer to Plaintiff, as she does when referring to herself.

1

and transferred again to the FCI-Beckley in West Virginia, where she indicates she is now housed in protective custody. (Doc. 10).

Under 28 U.S.C. § 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). This requirement applies equally to amended pleadings filed during the pendency of an action. The Court must dismiss any portion of the complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief. 28 U.S.C. § 1915A(b).

After fully considering the allegations in Plaintiff's First Amended Complaint, the Court concludes that some of the claims survive review under § 1915A.

### The First Amended Complaint (Doc. 9)

Plaintiff has been diagnosed with gender dysphoria ("GD") which she characterizes as "severe," and requires regular medication including hormone treatment in connection with her transition from male to female. (Doc. 9, pp. 7-8, 13). She has been on hormone therapy since the age of 18. (Doc. 9, p. 13). She has silicone breast implants as well as implants in other parts of her body. (Doc. 9, p. 8).

Plaintiff has a previously-filed action now pending in this Court, *Johnson v. Robinson, et al.*, Case No. 15-cv-298-JPG-RJD. That case involves allegations that Plaintiff was put at risk of harm by several cell placements, in violation of the Eighth Amendment; and was denied equal protection in her cell assignments, in violation of the Fifth Amendment. The Defendants in that action are Greenville officials Rosalind Robinson and Waleska Lirios. Neither of these individuals is named as a Defendant in the case at bar. Plaintiff refers to Robinson and Lirios[2]

---

[2] At times, Plaintiff spells the surname as "Lirious" although it is clear she is referring to the same individual.

several times in the First Amended Complaint, and accuses several Defendants herein of taking adverse actions against her in coordination with Robinson and/or Lirios.

Plaintiff organizes the statement of claim according to the incidents and actions/omissions involving each Defendant, starting with Dr. Kruse, the Greenville physician.

Plaintiff arrived at Greenville in July 2012, and went through medical and mental health screening. In mid-August, Plaintiff had a medical visit with Dr. Kruse, in which she explained the prescribed hormone treatment that she had been receiving while in federal custody in Tennessee. (Doc. 9, p. 8). Dr. Kruse interrupted to say that the BOP will not pay for Plaintiff's surgeries. Plaintiff indicated she was not seeking surgery while in prison. Dr. Kruse stated he would have to cut Plaintiff's hormone therapy until he checked with the regional medical doctor. As a result, Plaintiff received no medication until September. Plaintiff sought help from the head psychologist at Greenville (Dr. Hernandez), who contacted Dr. Kruse. In about a week, Plaintiff was put back on her hormones, but was not given her Spironolactone.

In December 2012, Plaintiff again saw Dr. Kruse, and explained that the Spironolactone was to block the hair growth on her face, to help with breast growth, and to help her implants stay fluid so they would cause less pain. (Doc. 9, p. 8). Dr. Kruse said that the BOP would not make men into women on taxpayers' money. He was taking Plaintiff off the Spironolactone due to high level serum potassium (hyperkalemia).[3] Plaintiff requested to be given Finasteride, which was safer and had worked in the past, but Dr. Kruse refused.

Plaintiff had multiple bathroom issues because of her medications, including anti-viral drugs that her body was adjusting to. She frequently needed to go in the middle of the night, but was not always able to make it from her top bunk to the toilet in time to avoid having an accident

---

[3] Sprinolactone, which is a diuretic, should not be taken if a patient has high potassium levels in the blood. Https://www.drugs.com/spironolactone.html (last visited Aug. 23, 2017.

and soiling the lower bunk where another inmate was sleeping. Plaintiff's cellmates had slapped and choked her when this happened. Often when she woke in the night, her lower legs had no feeling, impairing her movement. Plaintiff asked Dr. Kruse for a bottom bunk pass due to these problems, but he refused.

One night in September 2012, Plaintiff had to get up to use the toilet, but had no feeling in her legs. She jumped down from the top bunk, and when she landed, she damaged the silicone in her left and right hips. This happened on 2 other occasions. As a result, silicone started slipping down her hip and leg area. Plaintiff showed the damage to a physician assistant, who sent Plaintiff to Dr. Kruse. Plaintiff asked Dr. Kruse again for a bottom bunk permit, but he refused. Dr. Kruse gave Plaintiff a prescription for painkillers and told her she "would get use[d] to it." (Doc. 9, p. 10).

Dr. Kruse further refused to allow Plaintiff to have hair removal products, forcing Plaintiff to use a razor to shave her face. The hormone treatment softened Plaintiff's skin, and the razor use has caused permanent facial scarring.

Plaintiff complained to Warden Cross in writing and in person about Dr. Kruse's refusal to address her medical needs, to no avail. Plaintiff notes that the BOP has an established policy regarding medical treatment for transgender inmates (P 6031.04[4]), which Dr. Kruse ignored.

As a result of Dr. Kruse's deliberate indifference, Plaintiff suffers from muscle spasms, severe mood changes, suicide contemplation, and inability to concentrate, as well as the facial scars. The damaged silicone causes pain, and may need to be surgically removed. (Doc. 9, p. 10).

---

[4] The Bureau of Prisons Program Statement No. 6031.04 (Patient Care) contains a protocol for the medical and mental health evaluation of inmates who may have "Gender Identity Disorder," which should then be followed by the development of a treatment plan, at Section 30. *See* Website of the Federal Bureau of Prisons, https://www.bop.gov/PublicInfo/execute/policysearch# (last visited Aug. 23, 2017).

Plaintiff brought in person to Warden Cross a number of complaints regarding her cell assignment, assaults on her, and inadequate medical care by Dr. Kruse. (Doc. 9, p. 11). In September 2012, when Plaintiff spoke about these concerns to Cross for about the 5th time, Cross stopped Plaintiff in mid-sentence to say he was a "God-Fearing Man and he will not entertain the transgender bull crap." (Doc. 9, p. 11). Later, after Plaintiff was moved to the Re-entry unit in October 2012, Plaintiff filed for an administrative remedy over actions of her unit manager and counselor. Plaintiff asserts that this angered Warden Cross, and soon after this, officers and counselors targeted Plaintiff with cell searches and rude remarks.

In March 2014, Warden Cross, along with Unit Manager Robinson and Counselor Lirios, searched Plaintiff's cell as part of a security shakedown of the area. Cross instructed the unit manager and another officer to take all feminine or female items from Plaintiff's cell, including undergarments, bras, and makeup. (Doc. 9 p. 12-13). The loss of these items was traumatic to Plaintiff, and she also claims that she was unfairly singled out for disciplinary action. Torn mattress(es) amounting to hundreds of dollars, and food service items were found in another cell, but no ticket was issued to the occupant(s). Plaintiff lost good time as a result of the disciplinary proceeding. She filed for a remedy with Warden Cross, but he denied it, and Cross "tried to silence" Plaintiff. (Doc. 9, p. 13).

In October 2012, Plaintiff moved to the Re-entry program, where Zellda Bell was the Re-entry Counselor in charge of programming, bed assignment, and other matters. In late November 2012, Bell told Plaintiff that her boss (Unit Manager Robinson) was complaining about Plaintiff's makeup and hair length. Plaintiff told Bell that she is transgender and does not apologize for her situation. Bell said she did not care about "the Transgender Bull-crap" which has no part in the "Christian value system" under which she runs the Re-entry program. (Doc. 9,

p. 14).  Bell told Plaintiff she was "getting harsh warnings" to deal with Plaintiff's manner of female presentment.  Bell personally searched Plaintiff's cell and took all her female items.

On another occasion, Plaintiff reported to Bell that Plaintiff had been sexually assaulted, to which Bell responded that it was Plaintiff's fault, and told Plaintiff, "welcome to being a female."  (Doc. 9, p. 14).  Plaintiff complained about this response to the unit manager and to Warden Cross.  When Bell learned of the complaint, she told Plaintiff she hated a snitch and Bell would make it her business to get Plaintiff out of the Re-entry Program.  (Doc. 9, p. 15).

On November 21, 2013, Plaintiff went to Secretary Warren to request indigent supplies of soap and toothpaste, as per procedure.  Case Manager Mickelson was present in Warren's office.  Bell interrupted Plaintiff's request to yell at her, "What the hell you want?"  (Doc. 9, p. 15).  Plaintiff told Warren she would be back later; Bell mimicked pushing the panic button and shouted at Plaintiff to "get the hell out."  *Id.*  Ten minutes later, Mickelson sent Plaintiff to see Lt. Spence (of SIS).  Plaintiff, in tears, explained the incident to Lt. Spence.  Spence informed Bell and the unit manager that Plaintiff was not lying and would not go to the SHU.  However, after Spence left for the evening, Bell got a unit manager to sign off on sending Plaintiff to the SHU, and Bell wrote Plaintiff up for insolence.  The secretary (Warren) and Mickelson wrote supporting statements for Bell.  (Doc. 9, p. 16).  Plaintiff lost good conduct time as a result of this incident.  (Doc. 9, p. 18).

When Plaintiff later got out of the SHU, Bell had her housed back on unit H2-A, where Plaintiff had been assaulted before going to the Re-entry unit.  Bell also secured the agreement of H2-A Counselor Lirious to take away all of Plaintiff's privileges (phone, e-mail, commissary, and visits).  (Doc. 9, p. 16).  When Plaintiff asked Bell why she was being penalized, Bell stated that Plaintiff "could suck c**k for soap and toothpaste as far as she cared," and she would keep

Plaintiff on restriction until her retirement. (Doc. 9, p. 16). Plaintiff claims that Bell caused her "pain, rapes, and suffering." *Id.*

Plaintiff's claim against Case Manager Mickelson is based on the Nov. 21, 2013, incident where Bell wrote an allegedly false disciplinary report on Plaintiff after Bell yelled at Plaintiff in Warren's office. According to Plaintiff, Mickelson "witness[ed] a[n] entire crime" of Bell falsely accusing Plaintiff in order to get her out of the Re-entry program. (Doc. 9, p. 17). Mickelson wrote a supporting statement about the incident, which was used to send Plaintiff to the SHU. Plaintiff reported the alleged false statements to Lt. Spence, and sought an administrative remedy that was denied.

Similarly, Secretary Warren wrote a statement allegedly supporting Bell's version of the events on November 21, 2013. Plaintiff again characterizes the incident as "a crime" against her, and claims that because no staff member would tell the truth, Plaintiff was sent to the SHU and lost good conduct time. In the course of Plaintiff's attempt to seek an administrative remedy, she was told by Warden Cross that he denied Plaintiff's grievance because of the supporting statements of the staff members. (Doc. 9, p. 18).

After Plaintiff was released from the SHU and placed back on unit H2-A, Robinson and Lirios instructed Officer J. Ashmore to watch Plaintiff. Plaintiff was told to report to the lieutenant's office, where Lt. Butler told her she was going to P.C. (protective custody). (Doc. 9, p. 19). Plaintiff objected and assured Butler she would stay in her cell. However, Ashmore stopped Plaintiff on the way back to her cell, to say that other inmates had already been moved into the cell. Ashmore sent Plaintiff back to Butler's office, where Butler told Plaintiff that Ashmore had found a knife under the sink in the common area of the cell. Plaintiff tried to explain that Ashmore planted the weapon because gang members wanted the cell. However,

Plaintiff was disciplined and lost more good time.

I.T.S. Supervisor Albert was one of the officers who searched Plaintiff's cell in March 2014, along with Robinson. On orders from Warden Cross, Albert took all Plaintiff's female undergarments and other items, which Plaintiff claims was an attempt to make her have a "meltdown" because of her gender dysphoria. (Doc. 9, p. 20). Albert also issued a disciplinary charge against Plaintiff for having in her locker some of her "medically infused implanted hair" that had fallen out earlier that day due to stress. Plaintiff lost good time as a result of the disciplinary action. After the shakedown, Albert and Robinson laughed at Plaintiff and pointed at her breast implants as she was not wearing a brassiere. Albert (as commissary supervisor) also denied Plaintiff hair removal products, without which Plaintiff's face became scarred from using a razor to shave. Plaintiff claims that these actions were "part of the payback game for notifying the courts." (Doc. 9, p. 20).

In August 2014, Plaintiff was in housing unit H3-A. At a time when Plaintiff was eating lunch at a table with a gay inmate, Bell loudly stated that she had a trained pit bull that was coming for Plaintiff. Plaintiff ignored Bell, as plaintiff was trying to stay away from Bell because of their past encounters. Plaintiff had been told that a new officer, S. White, who was close friends with Bell, was being assigned to unit H3-A, and to be careful. (Doc. 9, p. 21).

In October 2014, White "watched [Plaintiff] very hard." *Id.* While Plaintiff was away from the unit picking up her noon medications, White stripped Plaintiff's cell. Plaintiff returned to find her property thrown around, bagged up, and torn up. White took merchandise that inmates use to make pizza out of Plaintiff's cell, and wrote Plaintiff up on charges of stealing, possessing contraband, and other offenses. White also took Plaintiff's sport bra and support undergarments. Plaintiff lost more good time as a result, and her administrative complaint was

disregarded by Warden Cross.  (Doc. 9, p. 22).

In January 2016, while Plaintiff was out of her cell for breakfast, Officer Miles took all of Plaintiff's undergarments and threw them in the middle of the inmates' common area.  When Plaintiff returned, Miles ordered her to strip so he could take the rest of her undergarments. Plaintiff complied.  Miles then stated that Plaintiff "was a homosexual man" and was "nasty." (Doc. 9, p. 23).  Miles trashed all Plaintiff's belongings.  Plaintiff sought a state court injunction against Miles without success.

As relief, Plaintiff seeks to have her good conduct time restored, and requests punitive and actual damages.  (Doc. 9, p. 6).

## Merits Review Pursuant to 28 U.S.C. § 1915A

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into the following counts.  The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court.  The designation of these counts does not constitute an opinion as to their merit.  Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice.

> **Count 1:**  Dr. Kruse and Warden Cross were deliberately indifferent to Plaintiff's serious medical/mental health needs, in violation of the Eighth Amendment,  by discontinuing Plaintiff's prescription medication, refusing to provide alternative medication, denying a lower-bunk permit, and denying hair-removal products, starting in August 2012;
>
> **Count 2:**  Dr. Kruse and Warden Cross violated Plaintiff's Fifth Amendment right to equal protection by discriminating against her based on her transgender status, by denying her medical care/accommodations as described in Count 1;
>
> **Count 3:**  Albert discriminated against Plaintiff based on her transgender status when he denied her commissary request for hair-removal products;
>
> **Count 4:**  Albert retaliated against Plaintiff in violation of the First Amendment

when he denied her commissary request for hair-removal products on account of Plaintiff's litigation activity;

**Count 5:** Plaintiff was targeted for discriminatory cell searches and confiscation of her undergarments because of her transgender status, in violation of her right to equal protection, by Bell (in October 2012), Cross and Albert (in March 2014), White (in October 2014), and Miles (in January 2016).

**Count 6:** The confiscation of Plaintiff's undergarments by Bell (in October 2012), Cross and Albert (in March 2014), White (in October 2014), and Miles (in January 2016), constituted deliberate indifference to Plaintiff's serious medical/mental health need for those items to address her gender dysphoria;

**Count 7:** Cross confiscated (or directed others to confiscate) Plaintiff's undergarments during the March 2014 cell search in retaliation for Plaintiff's administrative complaints, in violation of the First Amendment;

**Count 8:** Bell violated Plaintiff's right to equal protection by refusing to take protective or remedial action after Plaintiff reported a sexual assault on her in October 2012, because of Plaintiff's transgender status;

**Count 9:** On November 21, 2013, Bell brought a false disciplinary charge against Plaintiff, supported by Mickelson and Warren, in retaliation for Plaintiff's complaints against Bell, and/or as discrimination against Plaintiff based on her transgender status;

**Count 10:** Bell retaliated against Plaintiff for filing complaints against Bell, by revoking Plaintiff's privileges (including phone, e-mail, and visits) after Plaintiff was discharged from the SHU and placed in unit H2-A;

**Count 11:** Bell discriminated against Plaintiff based on her transgender status, by revoking Plaintiff's privileges (including phone, e-mail, and visits) after Plaintiff was discharged from the SHU and placed in unit H2-A;

**Count 12:** Ashmore planted a knife in Plaintiff's cell and then filed a false disciplinary charge based on the knife, causing Plaintiff to lose good conduct time.

Count 4 shall be dismissed without prejudice for failure to state a claim upon which relief may be granted. Counts 9 and 12 shall also be dismissed without prejudice at this time, because they are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), and thus fail to state a claim upon which relief may be granted. The remaining claims (Counts 1-3, 5-8, and 10-11)

shall proceed for further consideration at this time. The Court notes, however, that further factual development regarding the claims in Counts 5-7, which relate to incidents that resulted in discipline including the revocation of Plaintiff's good conduct credits, may reveal that all or some of those claims are also *Heck*-barred.

As an initial matter, Plaintiff is advised that the restoration of revoked good conduct credits cannot be granted in the context of a civil rights action. Release from incarceration (or earlier release through restoration of sentence credit) is a remedy available only in a habeas corpus action. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (dismissing civil rights claims that should have been brought as petitions for writ of habeas corpus); *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991). In order to seek restoration of good conduct credits, Plaintiff must bring a habeas corpus action pursuant to 28 U.S.C. § 2241 in the district where she is currently confined, to challenge the disciplinary action that resulted in the lost credits. Nothing herein should be construed as a comment on the merits of such a habeas action.

## Count 1 – Deliberate Indifference – Kruse and Cross

In order to state a claim for deliberate indifference to a serious medical or mental health need, an inmate must show that she (1) suffered from an objectively serious condition; and (2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. An objectively serious condition is one that significantly affects an individual's daily activities or which involves chronic and substantial pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). "Deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (internal citations and quotations omitted). *See also Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Perez v. Fenoglio*, 792 F.3d 768, 777-78

(7th Cir. 2015). However, the Eighth Amendment does not give prisoners entitlement to "demand specific care" or "the best care possible," but only requires "reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Further, a defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

Plaintiff's diagnosis of gender dysphoria, and her reliance on prescribed hormones and other medication to treat or maintain her physical condition as well as to manage pain, satisfies the objective component of a deliberate indifference claim at this stage of the case. Turning to the subjective component, some or all of Dr. Kruse's actions of terminating Plaintiff's hormone therapy, canceling Plaintiff's Spironolactone without any replacement medication, and denying Plaintiff's requests for a lower-bunk permit and hair-removal products may amount to deliberate indifference. Therefore, this claim shall proceed for further review.

While Warden Cross is not a medical provider, Cross's failure to take action to secure medical care for Plaintiff, after Plaintiff brought her complaints about Dr. Kruse to the attention of Warden Cross, may be sufficient to hold Cross liable for deliberate indifference. *See Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (prisoner could proceed with deliberate indifference claim against non-medical prison officials who failed to intervene despite their knowledge of his serious medical condition and inadequate medical care, as explained in his "coherent and highly detailed grievances and other correspondences"). Plaintiff claims that she spoke personally to Warden Cross about her medical issues on several occasions, only to be told by Cross that he would "not entertain the transgender bull crap."

**Count 1** may proceed for further consideration against both Kruse and Cross.

## Count 2 – Equal Protection/Discrimination – Kruse and Cross

The Supreme Court has interpreted the Due Process Clause of the Fifth Amendment as forbidding the Federal Government from denying to any person the equal protection of the laws. *See United States v. Windsor*, 133 S. Ct. 2675, 2695-96 (2013) (holding federal DOMA/Defense of Marriage Act unconstitutional under the Fifth Amendment); *Davis v. Passman*, 442 U.S. 228, 234 (1979); *Markham v. White*, 172 F.3d 486, 491 (7th Cir. 1999). Equal protection claims typically involve alleged discrimination on account of race, national origin or gender. Discrimination based on a person's transgender status or discrimination based on sex stereotyping may also be actionable as an equal protection claim. *See*, *e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

An equal protection claim may also be brought under a "class of one" theory, alleging that the plaintiff has been treated differently from others similarly situated, without a rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Class-of-one discrimination is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive ... comes down hard on a hapless private citizen." *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016) (internal quotations omitted) (quoting *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013), and *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)).

Here, Dr. Kruse's comments that the BOP would not pay for surgery or to "make men into women" indicates that he may have denied treatment to Plaintiff because she is transgender, and reflect particular animus toward Plaintiff. Likewise, Warden Cross's refusal to address Plaintiff's complaints about inadequate medical care may have been due to his intolerance of transgender individuals and refusal to "entertain transgender bull crap," as he put it.

At this stage of the case, Plaintiff has sufficiently pled an equal protection claim against Kruse and Cross for the denial of medical treatment, based alternatively on a class-of-one theory or on Plaintiff's identification as transgender, which survives threshold review. **Count 2** against Kruse and Cross shall also proceed for further consideration.

### Count 3 – Equal Protection – Albert

This count is based on Plaintiff's claim that Albert would not allow Plaintiff to obtain female hair removal products that she needed in order to avoid having to shave her face with a razor. Using a razor caused Plaintiff to suffer permanent scarring because of some of the medications she was on. According to Plaintiff, Albert "taunted" Plaintiff and told her that she "had to use magic shave like all men." (Doc. 9, p. 20). This incident may support a "class of one" equal protection claim, as well as one based on Plaintiff's transgender status and non-conformity with sex stereotyping. **Count 3** may also proceed in this action against Albert.

### Dismissal of Count 4 – Retaliation – Albert

Plaintiff claims that Albert's treatment of her was "part of the pay back game for notifying the courts." (Doc. 9, p. 20). This claim follows Plaintiff's description of Albert having denied her request for female hair removal products. It is not clear whether Plaintiff also meant to include other actions by Albert in March 2014, which included confiscating her female items from her cell and issuing a disciplinary report. In any event, Plaintiff fails here to state an actionable claim for retaliation, because she does not identify what litigation activity on her part allegedly prompted Albert to retaliate against her.

Prison officials may not retaliate against inmates for filing grievances or otherwise complaining about their conditions of confinement. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). "A complaint states a claim for retaliation when it sets forth 'a chronology

of events from which retaliation may plausibly be inferred.'" *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (citation omitted). In order to state a retaliation claim, the plaintiff must identify the protected action on her part (such as filing a grievance or lawsuit) that allegedly prompted the defendant to retaliate, as well as describe the defendant's adverse action that followed the protected activity. *See Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009).

Here, Plaintiff has not described what protected activity she engaged in that triggered the alleged retaliation on Albert's part. Plaintiff mentions only that she "notif[ied] the courts." Plaintiff did file an earlier lawsuit in this Court in 2015, but that action had not been filed as of the March 2014 date identified by Plaintiff in connection with her claims against Albert. Based on the factual allegations in the Complaint, Plaintiff has not set forth a chronology of events that supports a claim against Albert for retaliation.

**Count 4** shall be dismissed without prejudice for failure to state a claim upon which relief may be granted.

### Count 5 – Equal Protection/Discrimination – Cell Searches

Plaintiff describes 4 incidents in which she was targeted either to have her cell searched and/or to have her female undergarments and other feminine items confiscated, because of her transgender status or because of individualized animus toward her. Plaintiff was also charged with disciplinary infractions as a result of these searches, and indicates that in one instance, she was disciplined while other inmates who had contraband in their cell were not. Although these incidents occurred on different dates and involved different Defendants, they shall be considered together in Count 5 at this stage because of the similarity of the events and the applicable legal analysis.

In October or November 2012, after criticizing Plaintiff and informing her that Bell did

not care about "transgender bull crap," Bell searched Plaintiff's cell and took all her female items. (Doc. 9, p. 14). Plaintiff does not mention any disciplinary charge associated with that incident.

The March 2014 search conducted by Cross and Albert (with non-parties Robinson and Lirios) was part of a "security shake down" of units H2-A and H2-B, and included other cells besides Plaintiff's. (Doc. 9, p. 11). Cross specifically ordered the confiscation of any feminine undergarments and other feminine items in Plaintiff's possession. (Doc. 9, pp. 13, 20). Plaintiff was the only person in the searched area to receive a disciplinary ticket (C.D.V.) for contraband, although she claims contraband was found in at least one other cell. The Complaint does not disclose whether the "contraband" in question was her feminine clothing or something else unrelated to her gender dysphoria. It may have consisted of Plaintiff's hair which had fallen out. (Doc. 9, p. 20). Plaintiff lost good conduct time as a result of the ticket.

The October 2014 search by White also resulted in disciplinary action for stealing, contraband, and other charges. (Doc. 9, p. 22). During the search, White confiscated or destroyed Plaintiff's bra, support undergarments, and anything else she thought Plaintiff could use to relieve her gender dysphoria. *Id.* Plaintiff suggests that White specifically targeted her because of animus toward her as a transgender person, and because White was influenced by her friend Bell's desire to "get revenge" on Plaintiff. *Id.*

Miles appears to also have singled Plaintiff out for humiliating treatment in January 2016, either because of Plaintiff's transgender status or Miles' perception that Plaintiff was a homosexual. Miles took all of Plaintiff's undergarments out of her cell and threw them into the inmates' common area, then ordered Plaintiff to strip so that he could take the undergarments she was wearing. (Doc. 9, p. 23). Plaintiff does not mention that any disciplinary action was filed

based on that incident.

Each of these incidents may support an equal protection claim. However, further factual development may lead to a conclusion that Plaintiff's claims based on the incidents where she was disciplined and lost good conduct time (March and October 2014) are barred under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a civil rights action for damages that "would necessarily imply the invalidity of [a plaintiff's] conviction or sentence" is not cognizable until the conviction or sentence has been reversed, expunged, invalidated, or called into question by a federal court's issuance of a writ of habeas corpus. 512 U.S. at 486-87. For purposes of this analysis, "the ruling in a prison disciplinary proceeding is a conviction." *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011) (citing *Edwards v. Balisok*, 520 U.S. 641 (1997); *Gilbert v. Cook*, 512 F.3d 899, 900 (7th Cir. 2008)). In *Balisok*, the Supreme Court held that claims that "necessarily imply the invalidity of the deprivation of [the prisoner's] good-time credits" are not actionable under § 1983 (or *Bivens*) unless the prison disciplinary decision has been invalidated, even though the restoration of credits is not sought as a remedy. 520 U.S. at 646-68. Here, Plaintiff's request for restoration of her good conduct credits indicates that the disciplinary actions are still in force.

If Plaintiff incurred discipline in March 2014 or October 2014 for the mere possession of her female undergarments, for example, then the claims in Count 5 that her undergarments were confiscated in violation of her equal protection rights on those dates would likely be barred by *Heck*. On the other hand, if the disciplinary "conviction" would not be undermined by a finding that the targeted searches or confiscation of feminine items violated Plaintiff's constitutional rights, then *Heck* would not bar Plaintiff's equal protection claims for those 2014 incidents.

At this early stage, without a factual description of the disciplinary charges, the Court

cannot determine whether the claims stemming from the March and October 2014 incidents are prohibited by the *Heck* doctrine.  However, the October 2012 and January 2016 incidents, where no disciplinary ticket was issued, do not implicate *Heck*.  Each of the equal protection claims in **Count 5** shall proceed for further review at this juncture, but the applicability of *Heck* to the incidents that led to discipline shall be re-evaluated as necessary as the case moves forward.

### Count 6 – Deliberate Indifference – Confiscation of Feminine Items

The same 4 incidents described in Count 5 also support a potential Eighth Amendment claim for cruel and unusual punishment.  Each of the Defendants involved (Bell, Cross, Albert, White, and Miles) was aware of Plaintiff's identification as a transgender person.  It is not clear whether they knew about Plaintiff's gender dysphoria diagnosis as a recognized medical/mental health condition.  Plaintiff alleges, nonetheless, that these Defendants knew or intended that their confiscation and/or destruction of Plaintiff's feminine undergarments, support undergarments, and other feminine items would cause her distress or even physical pain.

The Eighth Amendment forbids unnecessary and wanton infliction of pain, and punishment grossly disproportionate to the severity of the crime.  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  The objective element of an Eighth Amendment claim requires a showing that the inmate was denied "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The subjective element of a deliberate indifference claim is satisfied if the prison official acted or failed to act despite the official's knowledge of a substantial risk of serious harm to the inmate.  *Farmer*, 511 U.S. at 842.  Mere negligence is not enough to violate the Constitution.  *See*, *e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

Arguably, and in Plaintiff's view, the actions of Bell, Cross, Albert, White, and Miles amounted to deliberate indifference to a serious risk of harm to Plaintiff's mental and physical health related to her gender dysphoria and implants.

As with Count 5, however, the fact that Plaintiff was disciplined in connection with the March and October 2014 incidents may bar her constitutional claims based on those events, pursuant to *Heck v. Humphrey*. The deliberate indifference claims against Bell, Cross, Albert, White, and Miles shall go forward in **Count 6** at this time, but the claims from March 2014 and October 2014 may be subject to dismissal under *Heck*.

### Count 7 – Retaliation – Cross

With reference to the March 2014 cell search and confiscation of Plaintiff's female clothing, Plaintiff indicates that Cross directed these actions against her as retaliation for her grievances and attempts to seek administrative remedies. (Doc. 9, p. 11).

As discussed above under Count 4, prison officials violate the First Amendment if they retaliate against an inmate for engaging in protected conduct such as filing grievances or complaints. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009). Plaintiff described a number of administrative remedies she filed before March 2014, as well as complaints she brought up in person with Cross, which may have motivated Cross to take adverse action against Plaintiff. These allegations state a cognizable retaliation claim. However, because the March 2014 cell search resulted in disciplinary action against Plaintiff that has not been reversed or invalidated, Count 7 may also be barred by the *Heck* doctrine. Plaintiff may proceed with the retaliation claim against Cross in **Count 7**, subject to later dismissal under *Heck* if appropriate.

**Count 8 – Equal Protection – Bell**

In approximately October 2012, Plaintiff claims that she reported a sexual assault upon her to Bell.  However, Bell failed to take any action to assist Plaintiff or investigate the incident, commenting that it was Plaintiff's fault, and stating, "welcome to being a female."  (Doc. 9, p. 14).  Plaintiff implies that Bell would have offered her some assistance but for the fact that Plaintiff presents herself as transgender and does not conform to male sex stereotypes.  Although Plaintiff's factual recitation of this incident is sparse, it arguably supports a claim against Bell for violating Plaintiff's right to equal protection.  **Count 8** shall therefore proceed for further consideration.

**Dismissal of Count 9 – False Disciplinary Charge – Bell, Mickelson, & Warren**

This claim is based on the November 21, 2013, encounter between Plaintiff and Bell, when Plaintiff went to Warren's office to request hygiene supplies.  According to Plaintiff, she attempted to quietly and politely leave the room when Bell yelled at her for no apparent reason. Nonetheless, Bell brought a disciplinary charge against Plaintiff for insolence based on the incident.  Mickelson and Warren wrote statements supporting Bell's charge.  Plaintiff was found guilty and punished with a loss of good conduct credits.  Cross denied Plaintiff's grievance over the charges.

This claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  A judgment in Plaintiff's favor for any constitutional claim arising from this incident would necessarily imply that the disciplinary finding of guilt was invalid, because the premise of Plaintiff's claim is that the charge was fabricated.  *Heck* states that before a plaintiff may recover damages for an allegedly unconstitutional conviction or sentence, the plaintiff must prove that the conviction or sentence has been reversed, expunged, or called into question by the issuance of a writ of habeas

corpus. *Heck*, 512 U.S. at 486-87. A guilty finding in a prison disciplinary action is a "conviction" for purposes of the *Heck* analysis. *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011). Until the disciplinary action is reversed, expunged, or invalidated, *Heck* dictates that a plaintiff may not maintain a constitutional claim for damages arising out of the disciplinary action. This is the situation presented by Plaintiff's claim in Count 9, regardless of whether the claim is characterized as one for retaliation, discrimination, or some other constitutional violation.

Accordingly, **Count 9** shall be dismissed from the action without prejudice. Mickelson and Warren shall also be dismissed as parties, because no other claims are asserted against them. Should Plaintiff succeed in obtaining a reversal of the disciplinary action in a habeas corpus or other proceeding, she may re-file this claim in a new action.

### Count 10 – Retaliation – Bell

This claim is based on Bell's revocation of Plaintiff's phone, e-mail, visitation, and other privileges after Plaintiff was discharged from the SHU and returned to housing unit H2-A. (Doc. 9, p. 16). It is not clear from the Complaint exactly when this occurred, but it was some time after the discipline imposed from the November 2013 incident. Plaintiff also indicates that Bell caused her to be placed into unit H2-A, which may have exposed Plaintiff to danger, as that is the location where Plaintiff had been assaulted before she was moved to the Re-entry unit.

These facts, coupled with Plaintiff's several administrative complaints against Bell for maltreatment of Plaintiff such as filing disciplinary charges on Plaintiff and confiscating her belongings on previous occasions, state a plausible claim for retaliation against Bell for revoking Plaintiff's privileges. **Count 10** may therefore proceed against Bell.

### Count 11 – Discrimination – Bell

This count is also based on Bell's conduct described in Count 10, of revoking Plaintiff's phone, e-mail, visitation, and other privileges after Plaintiff was discharged from the SHU and returned to housing unit H2-A, some time after November 2013. Bell's repeated comments expressing animus against Plaintiff for being a transgender person, Bell's longstanding hostility toward Plaintiff, and her comment that she would keep Plaintiff on restriction until her retirement, all support the claim that Bell singled out Plaintiff for harsh treatment. These facts state a discrimination/equal protection claim against Bell, based either on Plaintiff's transgender status, or on a class-of-one theory. Plaintiff may thus proceed with the claim against Bell in **Count 11**.

### Dismissal of Count 12 – False Disciplinary Charge – Ashmore

Finally, Plaintiff asserts that the disciplinary charge against her based on Ashmore's alleged discovery of a knife in Plaintiff's cell was false. Plaintiff denies having possession of the knife and believes that Ashmore planted it in her cell while she was away. Plaintiff was again punished with the loss of good conduct credits. (Doc. 9, p.19).

The analysis of this claim is virtually identical to that of Count 9. Any constitutional claims raised by Plaintiff against Ashmore for this incident must necessarily be based on the assertion that the disciplinary charge was fabricated. However, Plaintiff was found guilty and punished based on that charge, right or wrong, and the lost good time appears to still be in effect. Under *Heck v. Humphrey*, Plaintiff may only bring a civil rights claim against Ashmore based on these events if she first succeeds in overturning or invalidating the disciplinary "conviction" through a habeas corpus challenge, or by bringing a successful administrative complaint. Because this has not been accomplished, Count 12 must be dismissed at this time. *See Heck v.*

*Humphrey*, 512 U.S. 477 (1994).

**Count 12** shall be dismissed without prejudice for failure to state a claim upon which relief may be granted, because it is barred by the *Heck* doctrine. Ashmore shall be dismissed from the action, because he is not mentioned in any other claims.

**Disposition**

**COUNTS 4, 9, and 12** are **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted. Defendants **MICKELSON, WARREN, and ASHMORE** are **DISMISSED** from this action without prejudice.

The Clerk of Court is **DIRECTED** to complete, on Plaintiff's behalf, a summons and form USM-285 for service of process on Defendants **KRUSE, BELL, CROSS, MILES, WHITE,** and **ALBERT**; the Clerk shall issue the completed summons. The United States Marshal **SHALL** serve Defendants **KRUSE, BELL, CROSS, MILES, WHITE,** and **ALBERT** pursuant to Rule 4(e) of the Federal Rules of Civil Procedure.[5] All costs of service shall be advanced by the United States, and the Clerk shall provide all necessary materials and copies to the United States Marshals Service.

In addition, pursuant to Federal Rule of Civil Procedure 4(i), the Clerk shall (1) personally deliver to or send by registered or certified mail addressed to the civil-process clerk at the office of the United States Attorney for the Southern District of Illinois a copy of the summons, the First Amended Complaint (Doc. 9), and this Memorandum and Order; and (2) send by registered or certified mail to the Attorney General of the United States at Washington,

---

[5] Rule 4(e) provides, "an individual – other than a minor, an incompetent person, or a person whose waiver has been filed – may be served in a judicial district of the United States by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or (2) doing any of the following: (A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or law to receive service of process."

D.C., a copy of the summons, the First Amended Complaint (Doc. 9), and this Memorandum and Order.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings.

Further, this entire matter shall be **REFERRED** to the United States Magistrate Judge for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that her application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **REMINDED** that she is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in address; the Court will not independently investigate her whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: September 5, 2017**

*s/J. Phil Gilbert*
United States District Judge